**WARREN RURAL ELECTRIC COOPERA-
TIVE CORPORATION, Appellant,**

v.

**ELECTRIC PLANT BOARD OF THE CITY
OF BOWLING GREEN et al., Appellees.**

Court of Appeals of Kentucky.

March 13, 1959.

As Modified on Denial of Rehearing

Feb. 12, 1960.

Marshall Funk, Bowling Green, for appellant.

J. T. Orendorf, Parker Duncan, Bowling Green, for appellees.

MILLIKEN, Judge.

Here we have a jurisdictional dispute between two publicly owned public utilities about which one gets to supply electricity to a proposed new subdivision on the outskirts of the City of Bowling Green. In deciding the issue in favor of the Electric Plant Board of the City of Bowling Green, the learned chancellor, Hon. John B. Rodes, commented:

"Unless the parties carry out the true purpose and meaning of the statute (KRS 96.890) through some mutual agreement as to their respective fields and territories where they touch or clash, then it may result in some situation like the Gaza Strip where the United Nations had to be called in to keep the peace. This court expresses the hope that it may not be called upon to exercise such a function."

Apparently concurring in the conclusion that the Public Service Commission had no jurisdiction of their dispute (KRS 96.880 and 278.040(2)), the problem was presented to the courts when the appellant, Warren Rural Electric Cooperative Corporation, hereinafter referred to as the "Cooperative," sought an adjudication in a declaratory judgment action. Since 1927 the City or its predecessor, has supplied electricity to the home on the 186-acre farm near the city limits of Bowling Green. The home

and outbuildings are comparatively close to the City, but the farm itself dips like a peninsula into the territory served by the Cooperative. The subdivision on the farm will be spacious enough for two hundred homes, will be served by city water, and will depend upon electricity for heat and light. The proposed subdivision will be just 292 feet from a 12,500 volt line of the Cooperative, which supplies electricity to structures across the road from the Mitchell Subdivision. On the other hand, the City has only a 2,400 volt line serving the Mitchell homestead and outbuildings and would have to extend its line and voltage considerably at a cost of approximately $10,000 in order to serve adequately the proposed two hundred homes in the Mitchell Subdivision. While the annexation of the Mitchell Subdivision to the City is a possibility, perhaps even a probability, no steps toward that end have been taken. The record discloses that the parties amicably serve their respective portions of other farms in the twilight zone of their operations, and that the City has not made a practice of extending its lines since the advent of the Cooperative.

Implicit in the action is the economic factor—the Cooperative asserting that its extended operation into sparsely settled territory makes it imperative for it to insist upon serving the more densely settled areas within its amorphous territory if rates and costs are to be held down, while the City scoffs at that contention by pointing out the financing advantages Rural Electric Associations have under Federal Law. 7 U.S.C.A. §§ 902 and 903(c). The City also points out, as does the opinion of the chancellor, that the purpose of our Rural Electric Cooperative Act, KRS 279.-020(2), is to make electric energy available in "rural areas" of the State.

■ The judgment favoring the City was based on the fact that the City had been serving the Mitchell farm, that the developers of the Mitchell Subdivision requested it to extend its service to the farm, and that the City was ready and willing to do it. In the trial court's opinion the power of the City to extend its lines outside the city limits was recognized, and it was remarked that the proposed new Mitchell Subdivision lay "approximately adjacent to the city limits, falls naturally into its territory and besides may in the future be embraced by an extension of the municipal boundaries within the city limits. If so and if the Rural Cooperative was authorized to serve this subdivision so brought within the city limits, the term 'Rural' in the name of the Cooperative will lose its meaning."

■ Conceding arguendo that the Cooperative now may have lines more readily accessible to the bulk of the proposed Mitchell Subdivision, we cannot overlook the reasons advanced by the trial court as the basis of its decision. Nor do we believe the case presents a violation of the policy announced in KRS 96.890 that "No municipality or board operating an electric plant under the provisions of KRS 96.550 to 96.990 may enter into competition with, or construct, maintain, or operate, any facilities or service in competition with any rural electric cooperative corporation * * in any territory being served by" the other. We agree with the chancellor "that the plain purpose and intent of the statute is to prevent any public utility from competing with any other publicly owned utility in any territory being served by the other." The application of that principle to the facts was the problem left to the court to decide, and its solution requires the balancing of the conflicting factors presented in the interest of the community development regardless of which class of publicly owned utility happens to be the beneficiary of the decision.

This opinion does not conflict with the decision reached in City of Cold Spring v. Campbell County Kentucky, Water District, Ky., —— S.W.2d ——. Here we are governed by a statute (KRS 96.880) which specifically denies the Public Service Com-

mission jurisdiction over a municipality in the management and control of any electric plant whether within or without its boundaries.

The judgment is affirmed.